21-631, 21-633, 22-1587, 1199 SEIU et al v. Jan Alvarado Ramirez Gomez et al. And I'll say for these first batch of cases that I know there are a lot of overlapping issues and so we hope that you'll be mindful of that and not repeat the arguments of your co-counsel or opposing counsel to the extent that you can so that we can get through to the critical issues and have time to focus in on those. So with that, we will begin. Just in terms of how you're going to handle the response to the appellees, I don't know if you want to respond to all of the arguments at the end or go case by case. Your preference? The idea is not to repeat. And if you're going to make a responsive argument to the appellee, then you don't have to say it, you don't have to repeat it again. So it's one way to handle it. And the other way would be to also, if the appellants want to talk about how their case differs from the major case, that would be also very helpful. Because we basically don't want to hear repetitive arguments. So do you want to confer with yourselves a little bit about that? What would your preference be? Your Honor, we intend hopefully not to be repetitive and we will make appellee 1199 make one argument, and then the other set of appellees will make a second responsive argument in the first cases that are on the docket today. 1199 is not a party in the subsequent cases that are on the docket today, so the union 1199 will not be responding to arguments in those cases. Do the appellants have any position on this? Do you want to proceed seriatim first and then have the appellee respond? Or would you want an appellate after another and then have the appellee respond to everyone? Or would you just prefer to take it case by case? Your Honor, I think we just plan to address this as a main argument, and then Mr. Todrick will be the one to address the intervention part. All right. Well, perhaps it would make sense then just to go ahead and proceed case by case. Yes, but we're glad that you're all sort of focused on not repeating arguments. So we'll just, to keep things I guess less complicated, we'll go ahead and just go case by case. Okay. So first up, it would be Ms. Lusher. May it please the Court, my name is LaDonna Lusher, and I represent multiple appellants in this appeal. Do you want to put a mic close to you to just make sure that you speak up? Stand in the middle. Yes, how's this? Okay, thank you. This appeal is brought by former employees who have been litigating claims for statutory unpaid wages and pending class action lawsuits. But their claims were submitted to arbitration by the union and their former employers. This is despite the fact that these appellants have secured multiple court orders that have determined that their claims were not arbitrable by any agreement and also that the courts had the authority to decide the arbitrability issues. In fact, this court in its decision in the Garanova v. Estella Horton Home Care Agency decided, reviewed these same agreements that are at issue in this case and also the same alternative dispute resolution procedures and decided that there was no valid agreement that required these individuals to arbitrate their statutory wage claims. Could I ask one just contextual question first? Am I right that your clients sought to represent both themselves as well as a class of former employees? That is correct, Your Honor. Is it right that no class has been certified in any of the pending state court proceedings? Well, as of today, in the pending state court proceedings, there's been a class certified in the Teshevayeva action. There's also been a class certified in the Pistolnik action. And there was a class certified in the Troshin action, but that action has now settled. And do we have any idea of how large the class of former employees is that your clients seek to represent? Depending, the current appellants, depending on which case that you're referring to, it's hundreds, could be thousands of individuals. But the classes are limited to individuals that had left the employment of their former employer prior to the agreement that was executed in 2015, which we refer to in our papers, I'm sure Your Honors have seen, as the 2015 MOA. But I assume you said that as of today, a class has been certified in several of the actions. That's correct, that are proceeding in state court. We don't have any notice of that, though, right on our record. That is true, that is not. But those decisions were not submitted to this court. But the appellants that we represent today are former employees of First Chinese Presbyterian Community Home Fair, First Chinese Presbyterian Community Home Attendant Program, also Chinese American Planning Council Home Attendant Program, and Alliance for Health. And those actions, there has not been a class certified to date, but those actions have been stayed pending this court's determination on the underlying appeals. And those cases proceeded in state court and were allowed to proceed as fugitive class actions until they were removed to this court, I'm sorry, to the district court,  So there is an action pending state court in which no state was entered and a class has been certified. There are at least three today. At least three, that's Pustilnik and which? Pustilnik, Techevayeva, and then also the Trojan decision. But as I said, the Trojan decision has settled, so it's not an active matter anymore. But the court's class certification decision is publicly available. All right, thank you very much. Didn't mean to throw you off course here. No, no, thank you. And in fact, where those classes were certified, in each of those cases, and also in each of the cases where we represent the appellants against their former respective employers today, in all of those cases, the courts have rendered orders deciding that the pre-MOA, pre-2015 MOA employees that we represent could proceed with their claims because they aren't bound to any agreement to arbitrate statutory wage claims. And this court and the Indira Novi… You spoke a little quicker there. You say that they have ruled that the claims that proceed that are based upon the prior CBA are not, they can't be brought. Is that right? The arbitration can only relate to 2015. Is that what they've held? These courts have held that the claims that pertain to statutory unpaid wages, which is what these appellants have alleged, all under New York labor law, that those claims are not arbitrable if you left the employment of your employer prior to that agreement being executed. So it's only the 2015 MOA that requires arbitration of statutory wage claims. The New York Appellate Division has held at least four times that the only agreement that requires arbitration of statutory wage claims is the 2015 MOA. And, in fact, this court in its Garanova decision also made that the same determination. Right, but in Garanova, the claim that the 2012 CBA required, you know, delegated the question of arbitrability to the arbitrator was specifically weight. Like the court in Garanova specifically said, we're not ruling on that issue. That's correct. I'm sorry. So I'm not sure how much weight that should give to this case where that claim has been raised. Well, we would submit that the court's decision in Garanova is important and gives weight to the analysis of the different agreements. But you're absolutely right that the court did not reach the issue of who decides arbitrability. But the New York State Appellate Division has reached that decision at least two times and arguably three times because its Pustelnik decision cites the former two decisions. So in Hiches and also in Techevayeva, which we cite throughout our papers, the New York Appellate Division has already analyzed these exact same ADR provisions and has found that it was for the court to decide and not the arbitrator when it came. Does it matter? Is there any relevance to the distinction of a case where what's at issue is a motion to compel arbitration, which is I think the posture of some of those cases but not here. Because in the context of a motion to compel, obviously one of the employees, former employees, is an actual party to the action. And that seems a bit different than what we have here where the employees are not party to the arbitration. And what's being sought is not a motion to compel but essentially a motion, well, ultimately I guess a motion to vacate. Does that procedural difference make a difference to the analysis? I'm happy you're honored to raise that question because it absolutely does not. Basically, when courts are examining issues of threshold arbitrability, they have to look to New York State contract law principles, regardless of what the procedure, how the case came before the court, if you will. I see that my time is up. If I could finish this answer. So as this court also recently held in Sanchez v. Clipper Realty, which was a decision that got to the court based on a denial of a motion to compel arbitration, the court there also espoused the principle that no matter what, when you're looking at threshold issues of arbitrability, the court needs to look at state contract law principles. And when it looks to those, it looks to the decisions of the New York appellate division who have already determined these issues, unless there is clear evidence that the state's highest court would have decided differently. Here, the New York Court of Appeals has denied leave to review the Hichas decision and the Techev-Ieva decision, clear evidence that it agrees with the appellate division's holdings. And so throughout our papers, pretty much ad nauseum, is our position that the district court was bound to follow those New York appellate division decisions because they interpreted state contract law, and not only any state contract law, they interpreted these contracts and these ADR procedures and found that these individuals were not bound to arbitrate their statutory wage claims and that it was for the court to decide and not the arbitrator. Can I just ask you, and I don't know if I'm asking the right counsel for this, the question of standing, is there, well, I guess my question would be, what is your response to the district court's ruling on standing, which I think is your client as well. Yes, that's true, Your Honor. So our position is that the district court erred because all of the appellants have standing, at least as non-party. As I mentioned earlier, Mr. Toppenfeld is going to address the intervention aspect of it, but from our position, putting aside intervention, everyone that has standing is a non-party because their interests have been positively affected by the awards, both of them. And I believe that the union had made a motion to dismiss our first appeal based on lack of standing, and the motions panel found that at least one of the clients had standing because their interests had been positively affected. The named plaintiffs have standing because they have the right to vindicate the putative class member's rights who have purportedly been arbitrated because of these awards. They also had, in the Guzman and Alvarado actions, had outstanding motions to vacate the arbitrator's award, but the district court did not address those and instead went on to confirm the arbitrator's awards without looking at the arguments that were made on the motions to vacate. So that leaves those individuals with really no other avenue but to seek appeal of those decisions. They also have standing as non-parties because the costs that would now be presented to them would have been shared across the class had they been able to proceed on behalf of the class members. With your permission, if I may, I have a further follow-up practical question to you, which I think is best directed to you as I understand the Division of Responsibility, which is that this also isn't in the record, but on the union's website, I saw a report that $34 million in total has been distributed to 57,000 current and former home care employees and 42,199 represented agencies, and describing how that has happened beginning in, I think, April of 2023. What does that mean in terms of the practical realities of this case and unbinding it, which is, I think, what you're asking us to do? Yes, thank you, Your Honor. The practical realities are if this Court were to overturn the district court's confirmation orders, we would be proceeding on behalf of the named plaintiffs and the putative class members in the Guzman, Alvarado, and Chu matters. We would only be proceeding on behalf of the pre-2015 MOA employees. I thought you said there were 150,000. Well, the union, I think, has put information in their papers that the entire realm of current and former employees is around 100,000. How many of those are pre-2015 MOA employees, we do not know that to date, but I can tell you that just in the classes that are the putative classes of the Guzman, Alvarado, and Chu actions, that it's thousands of individuals. Those individuals would be able to proceed with their class actions. If they had already received and accepted their $250 payment and signed a release, are they done or would they have grounds and would you expect them to join your class and try to undo the release that they executed in accepting payment? Our position would be, and we feel that there's case law that supports this, that that would just be a set-off in any other action where they obtained damages, so that if the class actions proceeded and they received a judgment there and it was determined, let's say, for example, that Gail Yon was owed $1,000. Well, if they're not a member of the class and the class action wasn't appropriate, why would they be an offset? Would there be reimbursement for those circumstances? That just doesn't answer. That assumes that the state actions are going to win and make more money and, you know, be successful, and the litigation would be carried out on an individual basis over time. In other words, what you're saying is if they could find a way to, if there's a possibility of offset, that, of course, would be fine. Yes, that's what I'm saying. And in the other scenario, if there was no further recovery for these individuals, they would be able to keep the money that was given to them in the arbitration. And the reason I say that is because the union and the respondent employers took the risk of arbitrating those claims, knowing that these individuals had obtained court orders that said their claims were not arbitrable and that the arbitrator did not have authority to arbitrate them. So they assumed that risk. They would not be, they would not have to give the money back, but it would be counted as an offset if they were to give any future recovery. And the fact that the arbitrator excluded the individuals from the scope of the award doesn't affect your position because you would say, I take it, that they have the authority to, they would be an active representative of the class. Absolutely. And I would also just note that it's not like everyone here got mailed a check and was able to cash it. They had to file a claim form. So there could be some individuals that never received the information, never knew that there was this kind of arbitration, and that did not have an opportunity to fill out a claim form. And do you have any more specific idea of how many actual former employees fall into your class of individuals who ceased employment with a covered employer before 2015? I do not. No, I can only base it on representation of some of the other classes. But generally these agencies, depending on their size, it could be hundreds, it could be into the thousands. But we're not given that type of discovery because of the arbitration. And is it possible that they are still working in a covered employer but in a different location? It is possible. And therefore they may have continued to be members of the union, but their employment with a subject employer ceased, and then they picked up again. I mean, there are a lot of different individual circumstances that make me wonder whether you'd be able to satisfy the adequate representative requirement about class actions. Yes, Your Honor, there are those possibilities. I will say that there are many of these home health aid cases. Some of them involve 1199 members, some of them don't. But I will say that in the state courts there have been at least 16 of these actions certified already. So the adequacy has been met. But I understand Your Honor's question. These specific cases we have limited to only representing pre-2015 MOA employees. So we are not asking to represent anyone else. And so there I think that the similarly situated standard would be met as well as adequacy. As far as whether or not an individual went on to work for another covered employer, that did happen in some cases. But our position is that the court has to look at the agreement within itself, the four corners of each agreement that each agency signed with 1199. They're each distinct contract, and they have their subtle differences with each agency. We do acknowledge that the ADR procedures are substantively the same throughout all of the agreements. But each employer signed a collective bargaining agreement and supplemental memorandums of agreement with 1199. So each one has its own distinct collective bargaining unit that is only subject to those contracts that were in effect when they were employed. Let me ask a final question. The amicus brief that we received points out the nature and magnitude that was essentially a political question about how to take care of people who don't want to be put in an institution and yet need care throughout the night. No one's going to get a full five hours uninterrupted sleep and so on. Some of the regulations have been created without adequate data, for example, and that maybe a legislative fix of some kind is what is needed in terms of applying minimum wage laws and so on. Is there anything happening on that front that you can tell us about, albeit it wouldn't be in the record or essentially directly relevant here? I'm sorry, I didn't mean to interrupt you. I turned because there are several home health aides that are in the audience today and along with their advocates, and they have been campaigning hard for years to try to get the legislature to do something about particularly 24-hour shifts. I would submit that that's not for this court to decide today, but I will say that they have been advocating, they have been holding marches, and the amicus briefs that were submitted by some very, very skilled attorneys that have been involved in these issues are also advocating on that front as well to try to basically essentially get more protection for the home health aides to end 24-hour live-in shifts and also to try to provide them with more money. Thank you. Good morning, Your Honor. My name is Michael Tabenfeld, and I represent proposed intervenors of Chu, Chung, Ling, and Hichas, Carrasco, and Acosta who are from the CPC and the UJC cases. The question, as we noted earlier, I'm going to be dealing with the intervention and standing issues. The question really on these issues is if employees who have wage claims are dragged into an arbitration that they don't have to participate in, do they even have the right to challenge the award that is issued in that arbitration? The district court determined that they do not have that right. We contend that the district court got this wrong. To address the issue of standing, which I know Judge Lee brought up, there are two different issues of standing that the respondents have argued or claimed does not apply here. One is the standing under the LMRA. We acknowledge that in most contexts, virtually almost all contexts, usually an employee does not have the right to challenge an arbitration in court. The reason for that is because typically an employee is bound by what the union does because the courts do not want to allow employees to challenge all types of arbitrations and to flood the courts with these types of claims. However, the court has in the past deviated from that rule, which is only a general rule, as the court in Couture said, and essentially allowed individuals who have a sufficiently substantial and concrete stake in the action to intervene in that action. That's an association of contracting plumbers. Can I ask a question? Am I right in understanding that at least one of the people you represented did not move to intervene? Or did everyone move to intervene? I thought there was at least one or maybe two who kind of showed up and submitted some material to the court but never formally sought to intervene, and if not, should we treat that person differently? So that was Maria Diaz, who the district courts did say, I guess, showed up elatedly. We would argue for the same reason Ms. Lusser said, that even non-parties have standing, that she should be allowed, in theory at least, to intervene. We're really essentially only proceeding on behalf of the six individuals who are the main plaintiffs in the case. Just so we're clear on this, I want to get the dates right. These employees want to intervene. Are they present employees, essentially? They're not former employees. So all six of these employees stopped working before 2015 for the agency's notice. Before the MOA was signed in 2015. Okay. There's a dispute, I guess, about some of them, I think, about when exactly their employment ended. My clients contend that they stopped before 2015, but I know for at least three of them, Chu, Chung, and Ling, the CPC intervenors, they definitely stopped before the MOA was signed. I don't think there's any dispute about that. So the question is whether these individuals have a sufficient stake in the outcome, and we would say certainly at this point, they absolutely do. In October 2022, the district court entered an injunction against the three Fiches plaintiffs, prohibiting them from proceeding on behalf of the class in the state court case. And essentially, the logic there was that the class's claims had already been determined. And under the All Writs Act, Judge Kodal had the authority to enter an injunction to prohibit state court proceedings when the claims for that class has already been determined. There is no doubt that once a Chu case is no longer staged, that counsel for CPC or CPC will make an application to the same injunction, based on the same logic. Can I just ask you to just go back a little bit? You mentioned the standard in the Katir case, that as a general matter, if you are a member of the union, doesn't have standing independent of the union, that you typically, the employees typically would not have standing independent of the union. And you raised the fact that that is the general rule, but that there is an exception to demonstrate a particular interest. The interest that you are describing still sounds like the same interest of a union member as part of the union to get involved in the arbitration. I'm looking for something to show me that this is the situation that falls outside of Katir. I understood, Your Honor. And obviously, we acknowledge that the association case is not directly on point. What we say is that the Katir case is very different, because in Katir and pretty much all the cases like Katir, all the cases that are cited here, you have an individual who is, let's say, terminated or some action is taken against them. Their only remedy is through the union. There's no dispute about whether they have to arbitrate. And then the arbitration happens. They're unhappy with the results. And they want, let's say, they want the union to try to vacate the award, or they try to do it themselves. That's a situation which is fundamentally distinct from what happened here. Here we have state law claims under the New York legal law for individuals who are not bound by the arbitration agreement under which the arbitration proceeded. If these individuals are not entitled to challenge that award, they are basically dragged into arbitration and have no remedy. The only argument... Excuse me a second, though. The 2012 CBA had arbitration for grievances of various kinds. And the 2014 NOA said that the union was going to negotiate the statutory wage claims. It was after that that various people resigned, and seemingly the strategic way chose to terminate their employment in order to be able to challenge what was coming down the pipe, which was adding a specific provision in the NOA to make the wage claims arbitrable as well. But I take it that you don't think that the 2012 CBA provision or the 2014 was enough that they had acceded to arbitration as a strong way of resolving disputes, but that wasn't enough to cover the statutory wage claims in your view, and so they are still free of the 2015 NOA? Yes. I guess this is more of Ms. Lusher's area, but there are a number of First Department cases essentially saying that. I believe he just did, if I recall correctly, that the 2012 and 2014 agreements really did not clearly and unmistakably cover New York liberal claims. That's why they needed the 2015 NOA in the first place. And because that 2015 NOA was signed after these individuals no longer worked there, that NOA did not apply to them. So I'm not aware of any, certainly not my clients, resigning in order to challenge the NOA. They just happen to not be working there anymore. We actually represented individuals who worked for CPC at the time when the NOA went into effect. So they had a different kind of grievance, and the union had arbitrated that and they would be bound by that, but because there was no clear and unmistakable statement with regard to the statutory wage claims, the union was not free. There was no agreement that they were bound by to arbitrate these claims, and they're free to proceed separately. Correct. And we'd also argue that the union had no jurisdiction or rights to even proceed to arbitration in the first place. To the extent that the union or the agencies want to argue that our only remedy is a duty of fair representation claim, we argue that there was no duty in the first place. Essentially... Can you put me on? My understanding was that there was a grievance arbitration procedure in the pre-2015 agreements that were signed between employers and the union. There was a grievance procedure, a typical grievance procedure that you would have in a normal CBA if someone was terminated. It contained the language that grievance is subject to arbitration. It did, Your Honor, yes. And then it also specified that there would be binding arbitration. That was step four after the labor arbitration rules of the American Arbitration Association. I believe that is, Your Honor. I believe that's correct. Why isn't that a grounds for all of these cases for authorizing the arbitration system? So, again, I would direct the question to Ms. Lesher. I'm not sure that's really her area, but I can try to answer it, which is essentially... Maybe you have two shots at it. Yeah, so, essentially, this court in Agranova essentially held that, as well as in Sanchez and numerous first department cases, essentially said that the 2015 MOA is a separate document, and these two earlier versions... It supersedes the others? I would say... It doesn't invalidate it. It supplements it. The previous documents didn't cover wage claims. It doesn't abrogate those documents, so those would certainly apply. Maybe there's a refinement to it, as of 2015. But prior to that, it was a separate place. If they could support an arbitration, then there would be authorization for the prior arbitrations. Am I correct? There would be for arbitrations that don't involve wage claims. That's what it would be. It doesn't have a Supreme Court pen case. It doesn't involve wage claims. Right. It doesn't cover statutory claims, unless it's clearly unmistakably said so. Correct. That's what the Supreme Court said. Right, and the whole purpose of the 2015 MOA, as elaborated on by the 2014 MOA, is to create a procedure where New York liberal law claims and FLSA claims are subject to arbitration. The previous documents didn't do that. But there are instances, though, in which a union is obligated to represent former employees who are maybe current union members, or maybe their union membership is seized. In cases involving retirees, or someone gets terminated, and that is a grievance that the employee who's terminated wants to bring, the union has a continuing obligation of fair representation. So the former employee status, you're arguing more that they knew what the CBA was when they joined in 2012. They were okay with that. They left before the 2015 supplement, and they freed themselves of the mandatory arbitration position. But the union still had some kind of obligation toward them, didn't it? So we would argue the union doesn't, and we would say the union would have argued that in a different context. Are the former employees also former union members and no longer current union members? I know that the CPC intervenors are no longer union members. He says, I'm not sure if all of them are former or no longer union members, or if only some of them are no longer union members. Because former employment and union membership don't necessarily coincide in terms of timeline. Right, no, I certainly understand. They're essentially retired. These are older individuals, at least the ones that aren't working anymore are retired. So the union would have a duty of fair representation towards them, but just as to other benefits that are in the CBA that were established prior to their retirement. If they had gone to the union, our position is, if they had gone to the union and asked the union to grieve these claims back in 2016, the union would have said no, because the union did say that. And at that time, in letters, they said that people who stopped working for 2015, there's no jurisdiction for the arbitrator because these individuals are not covered by the 2015 MOA. Right, that was the position of the union in 2016. That changed in 2019. So if these individuals had gone to the union in 2016, the union would have said no, and if they sued the union for a breach of duty of fair representation, the union would have argued, you're not covered by this agreement. We have no obligation to arbitrate. Go to court. So how could there be a breach of duty of fair representation when there's no duty at all? That's essentially what the union would argue. We're saying the same thing, that there is no duty here for the union. The union had no involvement, should have had no involvement in this. And they decided to bring the claims, and the district court basically said, we don't have the right to challenge an improper assertion of the arbitrator's jurisdiction. That would be viewed to be unfair. And it's for that reason also that you say they have a personal stake that is immediately impacted and that would warrant their intervention. They certainly do, as well as class representatives. This court's decision in Jiang Jin, which is a Nepal, say, New York labor law case, slightly different context, but basically the same principle. In that case, the plaintiff went to trial, won, got paid every dollar, and this court said that even though the plaintiff has no financial stake anymore, they still have the right to proceed on behalf of the absent class members. And in that case, they had a right to appeal a decertification decision, despite having absolutely no financial stake anymore. So even if the HHS plaintiffs in this case are no longer required to arbitrate, they still have the right to protect the interests of the other individuals. Now, obviously, right now, they're under injunction, so they can't do that. But if this court were to reverse the district court's confirmation of the award, we would ask that the injunction be eliminated and we would try, if the injunction was eliminated, to proceed on their behalf in state court. Thank you. Ms. Blackstone. Good morning. May it please the court, Lorette Blackstone of Levy-Ratner for Appellee 1199-SCIU UnitedHealthcare Workers East. In February 2022, arbitrator Martin Scheinman issued a labor arbitration award ruling on a grievance brought by the federally certified and exclusive bargaining agent of 1199 on behalf of a nonpartisan organization of approximately 100,000 home care workers represented by 1199 at 42 home care agencies. That arbitration award, the second award issued in the case, resulted in the creation of a $40 million special wage fund, which has now been fully dispersed and paid to workers. Judge Kodal confirmed the second award in June 2022, and no party to the arbitration proceeding has filed a notice of appeal. What is before this court is a narrow and straightforward federal labor law proceeding arising under Section 301 of the Labor Management Relations Act, and we respectfully request that the court either dismiss the appeals or affirm the district court's decisions in their entirety. These consolidated appeals resulted because a group of 13 individuals, including seven who were expressly excluded from the awards, again, out of a universe of 100,000 workers, filed notices of appeal after the district court denied their motions to intervene, vacate, and or dismiss the union's petition. These individuals are complicating the issues in what is a very simple proceeding. As an initial matter, should this court conclude that the district court did not abuse its discretion in denying the motions to intervene, then there is no case or controversy before this court on the pending appeal. In actions arising under Section 301, it is federal law that governs, as the Supreme Court held in 1957 in Textile Workers of America v. Lincoln Mills of Alabama. In this federal labor law proceeding, the only questions before the district court were whether the two arbitration awards drew their essence from the party's collective bargaining agreement  had a barely tolerable justification for reaching his decision. Could you address the arbitration argument that a court under New York law decides whether there was an agreement to arbitrate, and then an arbitrator has authority based upon the agreement that was entered into about scope of arbitrability and other elements about how arbitration will proceed and adjudicating those disputes. It looks to me as though there was no agreement to arbitrate statutory wage claims as of 2012. Not any statement was explicit with a clear and unmistakable meeting that standard that the Supreme Court has set out. And that the district court and the arbitrator treated the coverage of the 2015 with the 2012 agreement  scope of arbitration, rather than whether there was an agreement to arbitrate. And I see those as two different questions. Am I misconceiving the issue here? So, let me see if I can address the issues you've raised. It's correct to say that the clear and unmistakable waiver of the right to bring statutory claims in court did not become part of the CBA until 2015. The 2015 MOA, however, was amending the existing collective bargaining agreement which had an existing agreement and arbitration provision. The question that was before the arbitrator and that is consistent with New York state law in terms of interpreting agreements to arbitrate was that the collective bargaining agreement empowered the arbitrator to determine the question of arbitrability. Whether there was indeed an agreement to arbitrate. Isn't that a prior question, though? Whether there was an agreement to arbitrate. And given that statutory claims are a special category and that the Supreme Court has said that you have to call them out specifically, couldn't an employee have said, oh, the union's going down this path now to address by arbitration my Title VII rights, my FLISA rights, and so on. I don't want to do it that way. I want to be able to go to court. And they quit before the 2015 agreement was adhered to. Are you telling me that an arbitrator would have been able to adjudicate pursuant to the 2012 CDA whether that person had a right to go to court over a Title VII or FLISA claim? Well, the question of consent, and I think Your Honor referred to this earlier in the context of the union's right to represent the former employee, the union is the exclusive certified bargaining agent of the employees in the bargaining unit. That consent was given by the bargaining unit when the union became the exclusive bargaining agent. When an employee leaves a bargaining unit, the employee doesn't withdraw that consent. That continues. The nature of the consent is what the question is, though. The consent was not to arbitrate in 2012. It's not to arbitrate wage claims. Right? Right, that's right. But in 2015, the collective bargaining agreement was amended to provide the right to arbitrate. And the question of the scope of that agreement was delegated to the arbitrator to determine. And the arbitrator, consistent with the intent of the parties, found that the 2015 MOA amending the right to bring statutory claims was an amendment of the existing grievance and arbitration procedure. But that was 2015. I mean, if an employee had gone to the union in 2014 and said, you know, these back-to-back shifts violate my statutory rights and I want to be paid more, would the union have an obligation to take that to arbitration then? Well, certainly the claim of whether the shift violated the collective bargaining agreement, the union would have had a new way to pursue that. I'm talking about just the statutory claims. And I understand that the union's position has changed over time, which I also find confusing. Yeah, I would say just to address the question of the change in position, the union never took the position that it could not pursue the statutory claims as of the amendment of the collective bargaining agreement in 2015. It declined. It said that those individuals, it was not going to object to them continuing to pursue their claims in court. And what about before? Prior to the 2015 MOA, there was no ability for the union to arbitrate statutory claims. So once the 2015 MOA took effect, it's not accurate to say that the union said that the union could not bring the claims. The union never said it couldn't bring the claims on behalf of former employees. It simply said that those employees, if they wished, the union would not object to their pursuing those claims in court. Later, the union determined that it was in the interest of all bargaining unit members to pursue a grievance across all 42 agencies at which the union represented employees. Including people who had left before 2015? I'm sorry. Including? Including. Including workers who had left. I'm having trouble just conceptualizing what this is. So the 2015 agreement, in effect, by consenting to the 2015 agreement, somehow that was an acceptance or a ratification of the earlier agreement covering, that would cover wages and the statutory claims? Well, it was an expansion of the existing grievance and arbitration procedure. You're saying, but it wasn't a new, a new agreement that those claims could be covered for the prior workers. It was a, it was somehow making it retroactive or maybe a better concept to use for that. But somehow, it necessitated the possibility of arbitration based on pre-2015 circumstances. Yeah, absolutely. I mean, the... So tell us how that... Yeah. Was there explicit language to that effect? Well, the 2015 amendment that made statutory claims part of the grievance and arbitration procedure is a very broad, it covers all claims, it has no temporal restriction, and so it enables the union to bring any and all claims within the statute of limitations that arise under the statute now of the collective bargaining agreement. The people who've left, are they still members of the union? At that point? Prior to 2015, if they've left? Well, if they've left, to the extent they have a claim that arose during their employment, they are members of the bargaining unit. So it covers all so-called prior claims of people who are no longer in the union as of 2015 because the claims arose when they were members of the union. Correct. And the union does owe, I know this was raised earlier, the union does owe a duty of fair representation to employees with respect to claims that arose during their employment. And in fact, although in this case, in these appeals, appellants are arguing that the union owes no duty, a number of the individuals who are move-ins have filed, in fact, charges claiming a breach of the duty of fair representation and the NLRB has repeatedly decided those claims on the merits of the charge and found there was no breach of the duty. Just to clarify one other thing, when a worker ceases employment, so a worker ceases membership in the union? If they are, in fact, a member. If they are a member. If they were a member before and now they can quit or move on to, you know, greener fashions or whatever it is, prior to 2015, they're no longer members of the union, are they? Yeah, I would say they are no longer members. No longer members of the union. And so under those circumstances, the union still has a duty of fair representation to them? That applies to prior claims? Absolutely, because regardless of their status of membership with the union, to the extent that they have claims that arose when they were a bargaining unit member, and regardless of membership, they were a bargaining unit member to which the union owed a duty of fair representation and for which the union was their certified and exclusive bargaining agent. And how do you propose that we think about the state court appellate division decisions that have seemed to go the other way and say that the statutory wage claims such as those asserted arise independently of the CBA and are not grievances, are defined by the CBA, and aren't subject to the arbitration? We have several state court decisions we're trying to, as a matter of New York law, we're about to look into those. I guess I would say a few things in response to that. What's before this court are two arbitration awards that were confirmed by the district court. Those decisions, while they could certainly have informed the arbitrator, were not binding on the arbitrator. And the arbitrator, in rendering his decisions, drew them from the essence of the collective bargaining agreement. And what this court must decide is whether the district court properly found that, in fact, the award should be confirmed because... If the arbitrator and the district court made a manifestly erroneous decision on state court law, are we bound to undo what they did? Certainly, if there was... In the appellate division, right? Yeah. I don't think either the arbitrator or the district court made an erroneous... Again, as a matter of state law, the question of whether the incorporation of the AAA rules, the question of delegating the question of arbitrability to an arbitrator, is consistent with state law. And I think that... I'm sorry to interrupt, but again, when we talk about the question of arbitrability, that's an umbrella for both the scope of an agreement to arbitrate as well as potentially whether there was an agreement to arbitrate at all. So maybe you could distinguish between those. I mean, if there's no agreement to arbitrate, the arbitrator has no authority at all. Right, but in this case, there was an agreement to arbitrate. The agreement to arbitrate was between the exclusive bargaining unit representative, the union, and the 42 employers. In 2015. As to these claims, but not before. You're saying claims prior to that would be covered. Absolutely. Claims prior to that would be covered. And I do think, to go back to the... Claims have been... State actions have resulted in judgments. Are those judgments invalid? Or are they out of case? In other words, a worker gets a judgment from the state court, and it's way in excess of $250. And it's paid, the case is closed. That case is not involved here. That case is not... I mean, the union would still... I don't know, are you asking if that case had been brought prior to the union? No, I'm asking... Well, I'm asking when... I guess that would matter. But I'm also wondering whether... I guess my understanding would be that there were prior cases in which judgments were regular. In the state court, money was paid over pursuant to those judgments. And they are no longer involved in this litigation. That's a separate matter. They're not being included. I mean, there are no... The appellant here did not have judgments... I'm not talking about these appellants. I'm talking about other people. There may have been. May have been. I don't know. Wasn't there, in fact, an injunction entered by a state court with regard to these proceedings? Or am I misremembering? Not with respect to these proceedings. There was an injunction rendered, and I'm sure counsel for the appellant knows this better than I do, but there was an injunction that said that an individual named plaintiff was not... could not be compelled to arbitrate. That injunction was not against the union, or it was... In that case, the union was not a party in any of those state court cases. So there was no injunction as to the union. And could you address Sanchez? Sure. I think Sanchez illustrates the issue that was raised by the panel earlier with respect to the difference between a motion to compel arbitration and a motion to confirm an arbitration award. The court in Sanchez did not involve any determination by an arbitrator of the issue of arbitrability, and the court there did not review an arbitrator's determination of arbitrability. And in fact, the district court in the Sanchez case spends a lengthy amount of time distinguishing this case from the circumstances in Sanchez. Well, but still, the court, we've talked about the provision did not extend  of employee's claims arising under federal and state law similar to 2012 here, the 2012 CDA, and then that there was an addendum that came later that was reported to cover the claim, and we said, no, that was not an agreement to arbitrate. Yeah. And that's very closely parallel to our circumstances here. So two distinctions. One, I think factually, as a factual matter in the Sanchez case, the agreement to arbitrate the statutory claims actually arose after the lawsuit was filed. That's one distinction. The other, the other I would say, again, going back to, the court there was simply determining in a case brought by an individual against their former employer whether there was an agreement to arbitrate and was not considering the question of delegation of the question of arbitrability and was in the procedural context of a motion to compel arbitration. Here, where the court is looking at whether, simply whether, the arbitrator was using the collective bargaining agreement in issuing an arbitration award, the standard is different. It's a deferential one and it's highly... But if it's built on an absent premise, you know, that there was an agreement to arbitrate, then it seems to me it still tumbles. I mean, what we said is Local 486 in Sanchez had no authority to negotiate any agreement on Sanchez's behalf after his employment with Clover Outstanding. Why doesn't that apply? That's even applied to... Well, I don't think... ...your adversaries. Mm-hmm. In that case, the court was determining the question of arbitrability. Here, the court is not determining the question of arbitrability. It was the arbitrator who determined the question of arbitrability. And in that case, the court, the district court, and this court must defer to that decision under the very deferential standard of review of an arbitration award. Don't courts typically decide whether there was an agreement to arbitrate? They do, but not where there is an express delegation of that question to the arbitrator. This court and the Supreme Court have said, even in the case that's cited by appellants in this case, the first options versus Chicago case, where it's clear that the parties have clearly and unmistakably delegated the question of arbitrability to the arbitrator, the appropriate standard of review is the same one that this court would review an arbitration award. It's a deferential one, which would only set aside an arbitrator's decision in very unusual circumstances, such as corruption, fraud, undue means, or an arbitrator exceeding his power. None of those allegations are made here. So the procedural, the way in which the Sanchez case came to this court is in a very different, it's a very different standard of review, and the court is not determining the question of who decides arbitrability. Thank you. Thank you. Mr. Kershner? Good morning, your honors. May it please the court, my name is Kenneth Kershner, a member of Hogan Levels. We represent the United Jewish Council of the East Side Home Attendant Service Corporation and the Chinese American Planning Council Home Attendant Program. We'd like to make the following four points. First, this case is distinguishable from the state court in Sanchez's motion to compel cases. Two, the interveners lack standing and the confirmation order should be deemed unopposed. Three, Judge Kodal correctly held the party's delegated arbitrability to the arbitrator and intended the 2015 MOA to apply to current and former employees. And lastly, the Supreme Court and the circuit cases require great deference to labor arbitration awards. The first point, the state cases in Sanchez are distinguishable for a number of reasons. With respect to Judge Lee's and Judge Carney's questions, unlike those cases, we are dealing with a grievance, not a court action, that has gone to arbitration, not whether it should be compelled to arbitration. This case involves a review of an arbitrator's award. But I'm sorry to interrupt, but I still have difficulty getting there. If there was no agreement to arbitrate, why do we have to defer to an arbitrator's decision on the merits of the claims wrong? There's been an agreement to arbitrate in the collective bargaining agreement since at least 2000. I know, but that agreement did not cover and was typically, labor agreements were typically not understood to require arbitration of statutory rights. It worked or had the right to go to a court for a discrimination claim or a wage claim such as here. But this provision in the grievance and arbitration procedure contains a reference to the rules of the AAA. And under Henry Schein and this court's contact decision, that requires it immediately to go to the arbitrator to determine arbitrability. Does that include the existence of an arbitration agreement? Absolutely. That goes to the arbitration issue. Exactly. I think that the existence of an agreement is somewhat  the scope of an arbitration agreement that is acknowledged. We would contend, Your Honor, that it talks about its jurisdiction and arbitrability. Further, just going along that point, this delegation clause has been in the agreement for more than 20 years. I'm sorry, just to follow through on that. So is your position that the reference to the AAA 47? I'm sorry? It's the reference to the American Arbitration Association's Rule 47? No, 3A. Oh, 3A, sorry. That mere reference is enough to put all statutory claims under the arbitration agreement that's in the ABA as of 2012? To decide whether he has, to decide arbitrability, that's correct. That's the same provision that was in Henry Schein and that's the same provision that was in Tompak. So why did we have this litigation thereafter about the need to explicitly, clearly, and unmistakably commit statutory claims to arbitration that came from the Supreme Court's decisions, 1410 Plaza and so on? Well, 1410 Plaza dealt with waiver of a statutory right, not with respect to the delegation clause that is, I thought, the subject of your question. 1410 Plaza was clearly on the issue of can a person have the statutory rights and the Supreme Court said absolutely. And by the way, the same would be true under state court law under life receivables. It follows the Henry Schein and contact decisions here. And in all other cases, the union and employer were not present. Here, the actual parties to the collective bargaining agreement, the union and the employer are the ones submitting the grievance to this arbitrator who has had more than 30 years experience in the home health care industry and the  care industry. The parties wanted uniformity and these 13 people who are seeking intervention are seeking to vacate an award that benefits thousands of employees who would not otherwise obtain the benefit. This was not introduced after litigation as in the Sanchez case. The litigation arose after the institution of the MOA except with respect to the Chan case. The Chan case, as you know, was compelled to arbitration. The Chan case, that brings me to the next point with respect to none of the movements to satisfy this court's requirements. The Chan case that was compelled to arbitration involves the Chu movements who were part of the class in Chan. That Chan case went to arbitration and Chan has now been dismissed with prejudice which may have an independent effect on the Chu movements. By the way, the Chu movement and several other interveners have filed as Ms. Blackstone indicated, a number of duty of fair representation claims which have been dismissed by the NLRB on their merits. That is footnote 4, page 61 of the second order. It is kind of disingenuous for the interveners to say there is no duty of fair representation required when they have filed numerous duty of fair representation cases that have been dismissed on the merits. The Chu movements, absolutely, yes. No question about it. And the NLRB is the one that has primary jurisdiction over duty of fair representation cases and they were the ones who said there is no, the union has not reached its duty. So the interveners have changed their tune and said you are not owed a duty of fair representation. But the NLRB investigated these claims and said once the union takes over these claims, they do have a duty to fairly represent the union. The union and region 29 as well as the NLRB and D.C. have dismissed all these cases and said no duty of fair representation. Therefore, they cannot satisfy the criteria in this case. And I believe Mr. Taubenfeld cited the association of contractor cases that dealt with union jurisdiction disputes, not employees at all. And in fact, when you read that case, it says very explicitly that employees need to show a breach of the duty of fair representation. So that case is clearly distinguishable and doesn't deal with individuals at all. That brings me to   which is how do we incorporate the AAA rules? It's undisputed that this delegation clause has been in the parties since 2000 or earlier, as in footnote 13, page 34 of the first award. I think one of the things that we're pondering about is how the CBA and that provision about arbitrability relates to the 2015 amendment and clarification and new agreement. I think that's part of what I'm struggling with. How should we conceptualize what the 2015 MOA is? So the arbitrator wrestled with that and spent a lot of time in the awards regarding that point and said he looked at the 2015 MOA and said it deals with all claims brought in any manner with no temporal limitation with a stated desire for clarity. And so what he said then was the parties are trying to find an expeditious way of resolving these cases through a single arbitrator not having many courts looking at these cases, not having many arbitrators look at these cases but want to have uniformity between the pre-2015 MOA employees and the post-2015 MOA. So is it your position that a race or sex discrimination claim that someone wanted to bring against the employers as a class action that the arbitrator could decide notwithstanding the fact that Title VII isn't listed in the 2015 MOA, the arbitrator could decide that that's arbitrable and it could undertake the arbitration resolution of that dispute. Why not? In the Pontier case there was a specific provision with respect to Title VII actions. But I'm asking here what is your position now today? It sounds to me as though you're saying that the arbitrator would have authority because of the reference to the AAA rules to decide whether any kind of statutory claim, not just the ones named in 2015, is arbitrable. And if the union and employer submitted it to an arbitrator, we would agree. Absolutely. Just like in this case. You're saying that the current... Yes. The arbitrator would then have to say I don't have authority because there is no delegation to me, there is no statutory right. And then, and that's what distinguishes this case, then you would say the arbitrator is not drawing his decision from the essence of the collective bargaining agreement if he then held that he had the right to adjudicate the Title VII action. That's exactly the point. So this is the right to decide the existence of an agreement to arbitrate in a particular field and the 2015 says yes you can arbitrate these statutory claims. Absolutely. What has happened in the state court cases was that the state court cases seemed to indicate that the collective bargaining agreement was somehow different than the 2015 MOA. But the 2015 MOA modified and extended the collective bargaining agreement. The grievance procedure was clearly a part and parcel and incorporated into the 2015 MOA. It didn't nullify the provisions of the delegation. It still looks as though the collective   an integrated collective bargaining agreement. I wish they would take more lead from this court and the district courts which seem to understand the delegation issue and the fact that this is an integrated collective bargaining agreement. Not interpreting a collective bargaining agreement. There's no motion to compel here. This case has two arbitration awards and really the question is did it draw its essence from the collective bargaining agreement. The last point is that the arbitrator exceeded his authority regarding arbitrability and jurisdiction. This court said in U.S. Steel and Carnegie pension fund versus Dickinson if an arbitrator offers even a barely colorable justification for the decision we will not vacate it on the basis of a claim he exceeded his authority by misinterpreting the party's contract. That's consistent with the steel workers trilogy and this court's NFL decision. In conclusion, we contend that the state cases are distinguishable and none of the movements have standing to intervene and the grievance was properly delegated to the plaintiff. Thank you.  have some rebuttal. Ms. Leiker. Thank you, your honor. I believe several points I would like to address. It's hard to be brief. First of all, as Judge Carney pointed out, there are numerous New York state appellate division decisions that have found that not only was there no valid agreement to arbitrate, but the arbitrator did not have authority to make these decisions. The New York appellate division found that the 2015 agreement is the only agreement that requires arbitration of statutory wage claims. That agreement says... I'll ask you a similar question. How do we conceive of the 2015 agreement in relation to the 2012 agreement? Looking at the 2015 MOA as a stand alone document, it clearly constitutes an agreement to arbitrate. I think you agree with that. But if this is a stand alone document that does not relate to the 2012 CBA, it's so minimal. It doesn't give details about how the arbitration is to occur. How is this independent of the 2015 MOA? The 2015 MOA says it's a new article and the arbitration is to be held exclusively from that article. If 2015 says look to this and look to this alone, what procedures does that contain? It says the parties are first to go to mediation, which they did. And it names the specific arbitrator that they are to go to mediation with. Then it also says that if the mediation is not successful, that I believe it's within four months that they have to file a claim of arbitration with a new    says that the arbitration is to be held exclusively and as opposed to let's say the 2012 CBA, which says that it only governs arbitration and grievances that were brought under if you had a dispute about the particular agreement, the term of the agreement. That lays out certain steps that are to be taken and then says that the grievances are subject to the triple A rules. Now, the 2015 MLA does not refer to the triple A rules and the appellate division has found that the individual employee wants to bring a claim under the 2015 MLA. They have to go to the union. They're not allowed to go by themselves. So then the union has to represent them and they have to go first to mediation. We've done the mediation and that hasn't worked. We know it means that  arbitrator has to go to the arbitrator. How is the arbitration going to occur? It doesn't reference triple A. It doesn't reference some other arbitration rules. How do parties know what to do if all they're relying on is the 2015 MLA? I believe there's language that says the arbitrator is going to lay out the procedures. It doesn't have the same exact steps that are laid out in the 2012 MLA. It doesn't have any steps. It says mediation. You have to go to mediation first. It tells you who the arbitrator is. It doesn't refer to other rules. It doesn't explain these are the procedures for the arbitration. Does it mean anything if we're supposed to look at this as a standalone document? I understand Your Honor's question and I'm not trying to be evasive about it. It does say that the arbitration    by the mediator and the arbitrator. The union and the respondents admit that they brought the arbitration pursuant to the 2015 MLA because they had to if they were going to arbitrate the statutory wage claim. They didn't follow the triple A rules. They followed the rules that were set forth by the mediator and the arbitrator. Arbitrator Simon who had set forth his own procedures and first decided he was going to have a hearing on arbitrability and they went under the rules that he  for that arbitration. The 2015 MLA may not lay out the procedures that your honor is referring to but it does lay out some procedures. It has been found that it does not incorporate the grievance procedure of the 2012 CBA nor does it refer to the triple A rules. It does say that the arbitration for those covered  is to be held exclusively within the procedures of the 2015 MLA. The steps that the parties took under the 2015 MLA were that only if you had an individual who went on to work for another agency who was then subject to that agency's 2015 MLA, that person's claims could be arbitrated and we acknowledge that. But each agency executed its own agreement with  2015 MLA. So on page A, 152 and 153 of the record, CPC's bargaining unit is defined and it says that that bargaining unit are the full and part time employees of that employer. So while the union and the respondents could go to CPC to arbitrate those claims, but anyone that had left CPC prior to the 2015 MLA being executed is no longer a member of that bargaining unit and each bargaining unit is defined in each collective bargaining unit. Well, if they would have continued to work there past the execution of the 2015 MLA, I would agree. That's the issue. She's making the argument that in effect the agreement said in 2015 in effect that prior to all claims are terminated and if all claims have eroded while the MLA was in office, the union would not have the authority to represent anyone that did not continue working for that particular employer. The union had no duty of fair representation with regard to claims like that. That's correct. No duty of fair representation. In fact, the union says, well, we could have gone on to arbitrate those claims back in 2016 if we wanted to, but we just chose not to. I want to point the court to page A-182 of the record, which is the union's letter to the first Chinese Presbyterian about some of the specific appellants that raised this appeal. I'm sorry, your honor. I'm on the record volume 1, page A-182. I know we have two different records here, but this is the lead case. So on page 182, we have submitted a letter that was written by the union in November of 2016 to  Presbyterian about some of the appellants that are here on this appeal. And in that letter, the union doesn't just say, well,   appellants that we choose not to. The union says that they object to the submission of the claims of these individuals to arbitrator Simon based on the fact that they were not employed by the first Chinese Presbyterian in 2015 and therefore are not subject to the alternative dispute resolution provision. They go on to cite the two decisions that were decided by Judge Forrest where she found that the members couldn't be bound to agreements that were not executed at the time that  decision was made. The decision was made on December 1, 2015, and therefore cannot be bound by the 2015 MLA including the ADR provision. So it's not that they chose not to. It's that was their position in 2016 that these individuals weren't subject to it because they were former employees. There was no duty of fair representation there. I know I'm out of time but I would like to address this decision because we do feel it's important here. This boils down to state contract law and what is within the four corners of that document. I would submit that the four corners define the collective bargaining unit and multiple state courts have found that these individuals are not there's no valid agreement to arbitrate their claims and the arbitrator does not have the authority to decide arbitrability. What's your response to the argument made by your adversary that the reference to the triple A article 3 in 2014 actually gave the arbitrator the authority to determine the scope of the arbitration agreement and his authority    scope of the arbitration agreement. Is that argument not made or something to the state court? It was made and commented on by the first department and it was also specifically commented on in Teche Bayeva. They referred to the fact that the court cited all of those decisions to say that this court is bound to follow New York state contract principles and that these things have been decided and defined. Those arguments were also argued in multiple other decisions that didn't make it to the New York appellate division. I wanted to say that Judge Walker asked what if a class member got a judgment against one of these agencies. For the court certification summary judgment has been rendered in favor of the class members. There has been a class certified in that action and it was granted by the state court and all that is left in that case is an inquest on damages. Thank you. I just want to really address the Katir issue and the duty of fair representation issue. I want to read from Katir to make it clear. We are making two arguments. Katir says if there is no claim that the union breaches duty of fair representation an individual employee represented by a union generally does not have standing to challenge an arbitration proceeding. That is page 2425 Katir versus Columbia University. First of all, Katir does not preclude an employee from bringing a claim even without a breach of the duty of fair representation. We would argue at a minimum that just like in the association case, we would ask the court to do in this case as well where employees are not bound by arbitration agreements and are forced into arbitration that they have the right to challenge being forced into arbitration when the arbitration essentially extinguishes or determines their rights. With regards to... That goes back to the question I had earlier. This is not a motion to compel arbitration. That is a little different than describing being forced into arbitration. That is not the precise issue. The purpose of the arbitration and the end result is to determine the claims for a number of clients and interveners and ultimately resolve them so they can no longer go to state court. Essentially they are dragged into arbitration. If we are right that the arbitration agreement does not apply to them, their claims are being determined by an arbitrator that had no right to determine them. It seems very strange that an employee in that context would not even have the right to challenge that arbitrator's decision. The employee's rights are being determined without the arbitrator  the right to determine them. The ultimate consequence is that this is not a motion to compel arbitration. That is not the issue in front of us right now. Your argument seems to be that yes, these decisions will have the right to make them. In terms of your view as well, it seems unfair that we have opportunities where an individual can make the claim or be in one of these other procedural postures where there is a party and that is      fair. If this court upholds the confirmation of the award, there will be injunctions entered in various cases prohibiting these employees from proceeding in state court. Their claims will be extinguished. Thank you.